1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Pimal Property, Inc.,                          No. CV11-02323-PHX-DGC

10                              Plaintiff,          **ORDER**

11   vs.

12   Capital Insurance Group, Inc., a Delaware
     corporation;    Eagle    West    Insurance
13   Company,   a   California   corporation;
     California Capital Insurance Company, a
14   California corporation,

15                              Defendants.

16

17          Plaintiff Pimal Property, Inc. ("Pimal") commenced this action in Maricopa

18   County Superior Court.  No. CV2011-016820.  On November 23, 2011, Defendants

19   Capital Insurance Group ("CIG," incorrectly identified as Capital Insurance Group, Inc.),

20   Eagle West Insurance Company ("Eagle West"), and California Capital Insurance

21   Company ("CCIC") removed the case to this Court.  Doc. 1.  Pursuant to the stipulation

22   of the parties (Doc. 16), Defendant CIG was dismissed with prejudice on January 10,

23   2012.[1]  Doc. 18.

24          Defendant CCIC has filed a motion to dismiss pursuant to Rule 12(b)(6) of the

25   Federal Rules of Civil Procedure.  Doc. 12.  The motion is fully briefed.  Docs. 12, 19,

26   20.  No party has requested oral argument.  For the reasons that follow, the Court will

27   ─────────────────

28          [1] CIG is a registered service mark that is not a legal entity capable of suing or
     being sued.  *See* Doc. 13 (CIG's motion to dismiss).

1   deny the motion.

2   **I.      Factual Background.**

3          Plaintiff alleges the following facts in the complaint.  At all times pertinent to the

4   claims asserted, Plaintiff owned the Sendero Ridge apartment complex at 945 West

5   Broadway Road, Mesa, Arizona 85210 ("the Property").  Doc. 1-1, at 11, ¶ 12.  The

6   Property is insured by one or more of the Defendants under policy number 6-BOP-2-

7   1576507 ("the Policy").  *Id.* at 11, ¶ 13.  When the Policy was issued, it was mailed to

8   Plaintiff with a cover letter from Peter Cazzolla, the President and Chief Executive

9   Officer of CIG, and was addressed to "CIG Policy Client."  *Id.*

10         Mr. Cazzolla is the Chief Executive Officer for CIG, CCIC, and Eagle West.  *Id.*

11  at 12, ¶ 14.  CIG, CCIC, and Eagle West share the same business addresses, website, and

12  telephone numbers.  *Id.* at 11, ¶ 11.  It is presently unclear which of the Defendants

13  actually issued the Policy.  *Id.* at 11, ¶ 10.  Some or all of the Defendants provide

14  insurance claims adjusting and related services for the insurance policies that they issue.

15  *Id.* at 12, ¶ 20.

16         On October 5, 2010, when the Policy was in effect, a major hail storm caused

17  significant damage to the roofs and various fixtures of the structures situated on the

18  Property.  *Id.* at 12, ¶¶ 17, 18.  Plaintiff engaged Skipton & Associates, Inc. ("S&A") to

19  assist with an insurance claim.  On April 12, 2011, S&A requested a copy of the Policy

20  from CIG.  *Id.* at 12, ¶ 21.  Phillip Henry, a General Adjuster for Defendants, assigned

21  Plaintiff a claim number in a letter to S&A dated April 13, 2011.  *Id.* at 12, ¶ 22.  In that

22  letter, Mr. Henry's signature block identified him as a General Adjuster for CCIC.  *Id.*

23  at 12-13, ¶ 23.  In subsequent letters, his signature block identified him as a General

24  Adjuster for Eagle West.  *Id.*  All emails from Mr. Henry had a signature block

25  identifying him as a General Adjuster for CIG.  *Id.*

26         Defendants hired American Technologies, Inc. ("ATI") and S&A hired Kowalski

27  Construction, Inc. to inspect the property and provide an analysis and estimate of the cost

28  of repairing damages caused by the hailstorm.  *Id.* at 13, ¶¶ 27, 28.  On or around

1   April 19, 2011, ATI and Kowalski Construction conducted an inspection of the Property.

2   *Id.* at 13, ¶ 29.  At this inspection, Mr. Henry instructed ATI to examine the roofs on only

3   two or three out of 22 buildings.  *Id.* at 14, ¶ 31.  Mr. Henry said that ATI would follow

4   up at a later date to inspect the remaining roofs, but never did so.  *Id.*

5          During the inspection, both ATI and Kowalski Construction agreed that the

6   Property had suffered damage as a result of the hailstorm.  *Id.* at 14, ¶ 33.  On April 22,

7   2011, Mr. Henry wrote an email to S&A claiming that ATI was unable to find any

8   damage.  *Id.* at 14, ¶ 34.  On August 5, 2011, on behalf of Plaintiff, S&A submitted a

9   claim to Mr. Henry that estimated \$472,578.97 in damages to the Property.  *Id.* at 15,

10  ¶ 39.   On August 30, 2011, ATI wrote to Kowalski Construction requesting further

11  information to finalize its estimate.  *Id.* at 15, ¶ 41.

12         On September 2, 2011, Mr. Henry wrote a letter to S&A in which he claimed to be

13  unable to accept or decline the claim due to a discrepancy in the scope of the loss.  *Id.* at

14  16, ¶ 44.  S&A responded with a letter on September 30, 2011, describing an error that it

15  had made and submitting a revised loss estimate of \$499,030.52.  *Id.* at 16, ¶ 45.  On

16  October 7, 2011, Mr. Henry formally denied Plaintiff's claim in a letter indicating that

17  the inspection revealed no damages.  *Id.* at 16, ¶ 46.

18         Plaintiff makes four claims: (1) tortious bad faith, jointly and severally against all

19  Defendants; (2) breach of contract, jointly and severally against all Defendants; (3) alter

20  ego liability, jointly and severally against all Defendants; and (4) in the alternative,

21  Defendants participated in a joint venture, acted in concert, and aided and abetted one

22  another in a tortious breach of duties owed to Plaintiff.  Doc. 1-1.

23  **II.     Legal Standard.**

24         When reviewing a complaint under Rule 12(b)(6), all allegations of material fact

25  "are taken as true and construed in the light most favorable to the non-moving party."

26  *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996).   To avoid a Rule 12(b)(6)

27  dismissal, the complaint must plead "enough facts to state a claim to relief that is

28  plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).  Dismissal

1   is appropriate where the complaint lacks a cognizable legal theory, lacks sufficient facts

2   alleged under a cognizable legal theory, or contains allegations disclosing some absolute

3   defense or bar to recovery.  *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699

4   (9th Cir. 1988).

5   **III.    Discussion.**

6         CCIC argues that dismissal of Plaintiff's breach of contract and bad faith claims is

7   appropriate because Plaintiff's insurance policy was issued by Eagle West, and therefore

8   no privity of contract exists between Plaintiff and CCIC.  CCIC further argues that the

9   complaint fails to assert sufficient facts to state a claim for relief under alter ego, joint

10  venture, or aiding and abetting theories.  Doc. 12, at 1-2.  Because the alter ego, joint

11  venture, and aiding and abetting allegations are forms of derivative liability arising from

12  the underlying substantive causes of action, the Court addresses the substantive claims

13  first.

14        **A.    Substantive Claims.**

15            **1.    Claim Two: Breach of Contract.**

16        Generally, privity of contract must exist before one may seek to enforce or defeat

17  the contract.  *See Samsel v. Allstate Ins. Co.*, 19 P.3d 621, 625 (Ariz. App. 2001), *vacated*

18  *on other grounds by Samsel v. Allstate Ins. Co.*, 59 P.3d 281 (Ariz. 2002); *Stratton v.*

19  *Inspiration Consol. Copper Co.*, 683 P.2d 327, 329-30 (Ariz. App. 1984) ("Since there

20  was no privity of contract between appellant and Inspiration, appellant has no claim for a

21  personal judgment sounding in breach of contract.").

22        CCIC denies having a contractual relationship with Plaintiff because the Policy

23  was issued by Eagle West.  Doc. 12, at 4.  CCIC has attached the Businessowners

24  Declaration portion of the Contract to its motion to dismiss.  Doc. 12-1 (Ex. A).  *See*

25  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the

26  'incorporation by reference' doctrine to situations in which the plaintiff's claim depends

27  on the contents of a document, the defendant attaches the document to its motion to

28  dismiss, and the parties do not dispute the authenticity of the document, even though the

1    plaintiff does not explicitly allege the contents of that document in the complaint.").  The

2    Businessowners Declaration confirms that Plaintiff's Policy was issued by Eagle West.

3    Doc. 12-1 (Ex. A).

4            Plaintiff does not dispute the authenticity of the Businessowners Declaration.

5    Plaintiff does not address its breach of contract claim or CCIC's lack of privity argument

6    in its response to the motion to dismiss.  Because Plaintiff and CCIC were not in privity

7    of contract, the Court will dismiss Plaintiff's breach of contract claim against CCIC.

8                        **2.        Claim One: Bad Faith.**

9            CCIC argues that Plaintiff's bad faith claim fails as a matter of law because CCIC

10   was not a party to the Policy and therefore owed no duty of good faith and fair dealing to

11   Plaintiff.  Doc. 12, at 5.  Plaintiff responds that CCIC is nonetheless liable for alleged bad

12   faith conduct as a participant in a joint venture with Eagle West.  Doc. 19, at 12.

13           CCIC cites *Walter v. Simmons* for the proposition that an insured cannot maintain

14   a claim for contractual bad faith against an insurance adjuster.  Doc. 12, at 5.  In *Walter*,

15   an independent adjuster "was dismissed from the bad faith claim because he owed no

16   contractual duty to act in good faith or deal fairly with [the insured]."  818 P.2d 214, 222

17   (Ariz. App. 1991).  It appears, however, that the bad faith claim in that case was

18   voluntarily dismissed by the plaintiff.  *See id.*  As the dismissal was not an issue on

19   appeal, the court's statement is descriptive dicta and does not resolve the issue under

20   Arizona law.  CCIC also cites *Walter* for the proposition that the duty of good faith and

21   fair dealing is a non-delegable duty of the insurer.  Doc. 12, at 5.  That holding is distinct

22   from the issue of whether an insured may bring a bad faith claim against a party who was

23   not in privity of contract.  As this District has noted, Arizona case law pertaining to

24   whether bad faith claims must generally fail due to lack of contractual privity is

25   ambiguous.  *See, e.g.*, *Ballesteros v. American Standard Ins. Co. of Wis.*, 436 F. Supp. 2d

26   1070 (D. Ariz. 2006); *Allo v. Am. Family Mut. Ins. Co.*, CV-08-0961-PHX-JFM, 2008

27   WL 4217675 (D. Ariz. Sept. 12, 2008).

28           *Sparks v. Republic National Life Insurance Company* is more informative.   In

1   *Sparks*, the Arizona Supreme Court discussed bad faith liability in narrower terms of joint

2   venture status between the insurer and insurance adjuster.   The court found that the

3   underwriter and the administrator of the insurance policy had a business relationship that

4   contained all essential elements of a joint venture.  *Sparks v. Republic Nat'l Life Ins. Co*,

5   647 P.2d 1127, 1138 (Ariz. 1982).   The underwriter and the administrator had an

6   agreement that the administrator would issue certificates of coverage, bill and collect

7   premiums, and handle the investigation and payment of claims.   The underwriter set

8   guidelines for the administrator to follow in deciding whether or not to pay any given

9   claim.  Based on this joint venture, the court held that "[b]oth owed a common duty to the

10   insureds: the duty to act in good faith."  *Id.*

11          CCIC argues that this case does not fit under the *Sparks* analysis because a joint

12   venture does not automatically arise from an affiliated group of insurance companies

13   operating under a group service mark, CIG.  Doc. 20, at 3.   But the complaint pleads

14   more.   Plaintiff alleges that "CIG, CCIC and/or Eagle West provide insurance claims

15   adjusting and related services for the insurance policies they issue."  Doc. 1-1, at 12, ¶ 20.

16   Plaintiff further alleges that "CIG is actively involved in the overall claims handling

17   process, by managing that process, by setting claims handling goals and objectives, and

18   by implementing (or failing to implement) proper claims handling rules, policies, and

19   procedures."  *Id.* at 17, ¶ 53.   While Plaintiff does not name CCIC, specifically, as an

20   entity involved in the claims process, the Court notes that CIG has identified itself as a

21   service mark owned by CCIC.  *See* Doc. 13, at 2.   Viewing allegations of material fact

22   and drawing all reasonable inferences in the light most favorable to Plaintiff, as the Court

23   must at this stage in the proceedings, the Court will construe the allegations relating to

24   CIG as allegations directed against CCIC as the owner of the CIG service mark.

25          The Court will deny the motion to dismiss the bad faith claim against CCIC

26   because Plaintiff has alleged sufficient facts to state a claim to relief that is facially

27   plausible under the *Sparks* analysis.  To the extent that bad faith liability in terms of joint

28   venture status remains an unsettled question in Arizona, this ambiguity should be

1      construed in favor of the plaintiff.  *See Allo*, 2008 WL 4217675, at *3 (citing *Albi v.*

2      *Street & Smith Publications*, 140 F.2d 310, 312 (9th Cir. 1944)).

3              **B.      Derivative Liability Claims.**

4                      **1.      Claim Three: Alter Ego.**

5              The alter ego theory allows a parent corporation to be held liable for the acts of its

6      subsidiary when the individuality or separateness of the subsidiary corporation has

7      ceased.  *See Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 728 (Ariz. 1991).  To

8      establish an alter ego theory of liability, a plaintiff must prove both (1) unity of control

9      and (2) that observance of the corporate form would sanction a fraud or promote

10     injustice.  *Id.* (citing *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. App. 1972)).  Claim Three

11     of Plaintiff's complaint asserts that CCIC and Eagle West are alter egos of CIG and that

12     CIG is liable for the actions of CCIC and Eagle West under the alter ego doctrine.

13     Doc. 1-1, at 23, ¶¶ 95, 96.  CCIC challenges the sufficiency of the complaint under both

14     prongs of the alter ego doctrine.

15             Plaintiff argues that the facts in this case are "remarkably similar" to the facts in

16     *Gatecliff*.  Doc. 19, at 6.  In that case, the Arizona Supreme Court concluded that

17     "observance of the corporate form could permit the two corporations to confuse plaintiffs

18     and frustrate their efforts to protect their rights before suit, while allowing the party

19     responsible . . . to evade liability after suit."  *Gatecliff*, 832 P.2d at 729.  The record

20     suggested that one company exercised "substantially total control over the management

21     and activities" of the second company.  *Id.* at 728-729.  Factors establishing

22     "substantially total control over the management and activities" include: (1) stock

23     ownership by the parent, (2) common officers or directors, (3) financing of the subsidiary

24     by the parent, (4) payment of salaries and other expenses of the subsidiary by the parent,

25     (5) failure of the subsidiary to maintain formalities of separate corporate existence,

26     (6) similarity of logo, and (7) Plaintiff's lack of knowledge of the subsidiary's separate

27     corporate existence.  *Taeger v. Catholic Family & Cmty. Servs.*, 995 P.2d 721, 733

28     (Ariz. App. 1999).

1    Plaintiff alleges the following facts in the complaint to show unity of control.  CIG

2 is actively involved in Defendants' overall claims process, manages that process, and sets

3 claims handling goals and objectives by implementing rules, policies, and procedures.

4 Doc. 19, at 8; Doc. 1-1, at 17, ¶ 53.  "CIG substantially controls the operations and

5 finances of Eagle West and CCIC."  Doc. 1-1, at 24, ¶ 98.  Defendants share the same

6 CEO, contact information, and letterhead.  Doc. 1-1, at 24, ¶¶ 99, 102.  Mr. Henry, who

7 denied coverage for Plaintiff's insurance claim, worked as a general adjuster for CCIC

8 and CIG.  Doc. 1-1, at 12-14, ¶¶ 23, 34.  Defendants intentionally blurred any distinction

9 between the entities in their dealings with Plaintiff.  Doc. 1-1, at 23-24, ¶ 97.

10    The complaint also alleges that to observe the corporate form "would be contrary

11 to public policy and would promote an injustice.  Doc. 1-1, at 17-18, ¶ 58.  In opposing

12 the motion to dismiss, Plaintiff argues that the complaint "provides a detailed description

13 of CCIC's bad faith conduct, largely while operating under its service mark," and that

14 "[u]nless the Court recognizes that CCIC is the alter ego of Eagle West, CCIC may

15 escape liability for its bad faith conduct."  Doc. 19, at 8.

16    At this stage, the Court will not dismiss the alter ego claim against CCIC.  The

17 Court recognizes that "[a]lter ego determinations are highly fact-based, and require

18 considering the totality of the circumstances in which the instrumentality functions."

19 *Legacy Wireless Servs., Inc. v. Human Capital, LLC*, 314 F. Supp. 2d 1045, 1058

20 (D. Or. 2004) (citations omitted).  Plaintiff has alleged enough facts in the complaint to

21 warrant further discovery on the alter ego issue.

22    **2.    Claim Four: Joint Venture and Aiding and Abetting.**

23    Claim Four of the complaint alleges both joint venture and aiding and abetting

24 theories of liability.  The elements of a joint venture are different from the elements of

25 aiding and abetting.[2]  The Court will not address the joint venture theory because CCIC

26

27    [2] A joint venture requires five specific elements: (1) a contract, (2) a common purpose, (3) a community of interest, (4) an equal right of control, and (5) participation of

28 both profits and losses.  A contract may be implied or inferred from the acts of the parties.  *Mercer v. Vinson*, 336 P.2d 854, 858-59 (Ariz. 1959).

- 8 -

1    challenges only the aiding and abetting theory.

2         Claims of aiding and abetting tortious conduct require proof of three elements:

3    (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the

4    defendant must know that the primary tortfeasor's conduct constitutes a breach of duty;

5    and (3) the defendant must substantially assist or encourage the primary tortfeasor in the

6    achievement of the breach.  *Wells Fargo Bank v. Ariz. Laborers, Teamsters, and Cement*

7    *Masons*, 38 P.3d 12, 24 (Ariz. 2002) (en banc).

8         The underlying tort for Plaintiff's aiding and abetting theory is Eagle West's

9    alleged breach of the duty of good faith.  CCIC's sole argument is that the complaint does

10   not allege any facts showing how it "substantially assisted" Eagle West in the

11   commission of the underlying tort.  Doc. 12, at 8.  The test for whether a secondary

12   tortfeasor rendered "substantial assistance" to establish liability as an aider and abettor is

13   whether the assistance made it easier for the violation to occur, not whether the assistance

14   was necessary.  *Wells Fargo*, 38 P.3d at 27.  Substantial assistance requires "more than 'a

15   little aid.'"  *Id.* at 26 (citation omitted).  Even ordinary course transactions can constitute

16   substantial assistance under some circumstances, such as where there is an extraordinary

17   economic motivation to aid in the fraud.  *Id.* at 27.

18        The complaint alleges that CIG is actively involved in the claims handling process

19   by managing that process, setting goals and objectives, and implementing rules, policies,

20   and procedures.  Doc. 1-1, at 17, ¶ 53.  The complaint also alleges that when Mr. Henry

21   acknowledged Plaintiff's claim and assigned Plaintiff a claim number, he wrote in his

22   capacity as General Adjuster for CCIC.  Doc. 1-1, at 12-13, ¶¶ 22, 23.  In his later emails

23   denying Plaintiff's claim, allegedly in bad faith, Mr. Henry wrote in his capacity as a

24   General Adjuster for CIG.  *Id.* at 13-16, ¶¶ 23, 34, 46, 47 (alleging that the October 7,

25   2011 letter formally denying Plaintiff's claim contained a signature block identifying Mr.

26   Henry as a General Adjuster for Eagle West, but that when the letter was sent to S&A on

27   October 10, 2011 from Mr. Henry's email account, it identified him as a General

28   Adjuster for CIG).  As discussed above, for the purposes of the motion to dismiss, the

1    Court will construe the allegations relating to CIG as allegations directed against CCIC as

2    the owner of the CIG service mark.  Given that Mr. Henry corresponded with Plaintiff

3    during the property inspection and ultimately denied Plaintiff's claim in his capacity as a

4    General Adjuster for CIG, Plaintiff has alleged facts showing that CCIC substantially

5    assisted the underlying breach of good faith.  The Court concludes that these factual

6    allegations are sufficient to state a claim under an aiding and abetting theory that is

7    plausible on its face.  *Twombly*, 550 U.S. at 570.

8         CCIC raises two additional arguments in its reply.  It argues that Plaintiff's

9    position is incongruent because Mr. Henry could not both represent CCIC in aiding and

10   abetting Eagle West, and then later simply represent Eagle West in the adjustment of

11   Plaintiff's claim.  Doc. 20, at 9.  The focus, however, is not on Mr. Henry as an

12   individual but rather on his role as a General Adjuster for CCIC and Eagle West.  It is

13   possible for CCIC to aid and abet Eagle West through the actions of a common

14   employee.  CCIC also argues that the complaint does not assert an extraordinary

15   economic motivation that can be construed as substantial assistance.  Doc. 20, at 9.

16   Under Arizona case law, extraordinary economic motivation is one factor that suggests

17   substantial assistance in the context of ordinary transactions, but is not a necessary factor.

18   Mr. Henry's denial of Plaintiff's claim as General Adjuster for CIG, if made in bad faith,

19   certainly meets the test articulated by the Arizona Supreme Court in that he "made it

20   easier for the violation to occur."   *Wells Fargo*, 38 P.3d at 27.   The Court will

21   accordingly deny the motion to dismiss the aiding and abetting theory against CCIC.

22        **IT IS ORDERED** that the motion to dismiss (Doc. 12) is **denied**.

23        Dated this 27th day of February, 2012.

24

25

26

27                                                   David G. Campbell
                                                     United States District Judge

28

- 10 -